J-S52024-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.T., MOTHER | : | No. 1440 EDA 2020 |

Appeal from the Order Entered June 25, 2020
In the Court of Common Pleas of Monroe County Orphans' Court at
No(s):  No. 8 OCA 2020

| | | |
|---|---|---|
| IN THE INTEREST OF: T.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.T., MOTHER | : | No. 1441 EDA 2020 |

Appeal from the Order Entered June 25, 2020
In the Court of Common Pleas of Monroe County Orphans' Court at
No(s):  No. 9 OCA 2020

BEFORE:   PANELLA, P.J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY McCAFFERY, J.:                    **FILED: JANUARY 8, 2021**

T.T. (Mother) appeals from the orders[1] entered in the Monroe County

Court of Common Pleas, Orphans' Court, granting the petitions of Monroe

County Children Youth Services (CYS) to involuntarily terminate her parental

---

[*] Former Justice specially assigned to the Superior Court.

[1] On September 1, 2020, this Court *sua sponte* consolidated the appeals from the two orders.

rights to her daughter, J.T., born in February of 2016, and son, T.M., born in

May of 2018, (collectively, the Children).[2]  After careful review, we affirm.

The orphans' court set forth the relevant factual and procedural history

as follows:

> This case has a long history.  The family has had an open case
> with [CYS] from September 29, 2017 through April 19, 2018, due
> to [Mother's] issues regarding mental health, lack of support
> system, and occasional domestic violence between the parents.
> On June 25, 2018, [Mother] attempted to surrender [T.M.] to the
> medical staff at Lehigh Valley Health Network Pocono under the
> Safe Haven Law, as she was feeling overwhelmed and unable to
> take care of her son.  Because [T.M.] was over [28] days old, the
> hospital was not able to take [him], and Stroud Area Regional
> Police and [CYS] were called per hospital protocol.
>
> Mother has a history of mental health issues, including
> Postpartum Depression and Bi-Polar Disorder.  She stated to
> [CYS] caseworker that she was able to care for daughter [J.T.],
> but unable to care for [T.M.]  She also stated that the [C]hildren's
> father . . . had left the residence and was no longer helping her.
> [CYS] contacted [Father] and paternal family members.  [Father]
> refused to act as a resource, stating it was fine for [T.M.] to go
> into foster [care] as he did not have the means to care for the
> baby.  In addition, he lived with his mother and grandmother and
> they did not want children in their home.
>
> A private arrangement was made with maternal
> grandmother, ensuring that [Mother] had no unsupervised contact
> with [T.M.]  Shortly thereafter, the maternal grandparents
> reported that they could no longer act as a long-term resource for
> [T.M.], and Emergency Protective Custody was granted by the
> Honorable David J. Williamson on July 3, 2018.  Protective

---

[2] By separate orders entered the same day, the orphans' court terminated the parental rights of T.M. (Father), the natural father of the Children.  Father attended the evidentiary hearing and indicated he did not contest the termination of his parental rights.  N.T. 6/24/20 at 87-89.  Father did not take an appeal, nor did he participate in Mother's appeal by filing a brief.

Custody was continued at the Shelter Care hearing on July 6, 2018. [T.M.] was adjudicated a dependent child by the Honorable Jonathan Mark by Order entered July 18, 2018. . . .

[Mother's] mental health deteriorated and Emergency Protective Custody of [J.T.] was granted on August 7, 2018 by the Honorable David J. Williamson. Protective Custody was continued at the Shelter Care hearing on August 10, 2018 and she was adjudicated a dependent child by the Honorable Jonathan Mark on August 22, 2018. The placement of [both children] was reviewed and continued by further Orders of the Court on January 25[,] May 13[,] September 4[,] and December 20, 2019.

[Mother] was criminally charged for an incident on August 13, 2018, [of] using a hammer to dismantle the siding and phone cables from a residence and striking a neighbor in the face with the hammer. [Mother's] behaviors continued to be of concern; she was taken by the police to be involuntarily examined pursuant to Section 302 of the Mental Health Procedures Act on September 11, 2018, and admitted to St. Luke's Gnaden Huetten Hospital. She made substantial progress and was discharged on November 1, 2018. [Mother] was assigned a caseworker through the Transition Age Youth ("TAY") program and the ReDCo Group ("ReDCo"), a behavioral health group, and also received services through the Street2Feet program. [Mother] attended her scheduled visitation, but appeared anxious during the visits which impacted her interaction with the [C]hildren. Visit Coach services were approved for her through JusticeWorks on January 14, 2019. [Mother] maintained communication with the caseworker during this time and obtained housing through the TAY program, although it was not suitable for children.

[Mother] continued to engage in mental health services through ReDCo: however, her behaviors continued to be erratic and unstable. She was then referred to the Assertive Community Treatment program and subsequently a referral was made for her to be housed and receive comprehensive mental health treatment at a Community Rehabilitation Residence host home in Carbon County. She was not taking her medication as directed and continued to display [very] unstable behaviors. Eventually [Mother] received services through New Perspectives, but became aggressive with the staff. By the time of the Permanency Review hearing on May 10, 2019, [Mother] had again been involuntarily examined pursuant to Section 302 of the Mental Health

- 3 -

Procedures Act and was at St. Luke's Gnaden Huetten Hospital since April 7, 2019. Visit Coach services were terminated upon her admittance to the hospital. She was discharged to a group home in early July [of] 2019, and started attending visitation with her children later that month.

[Mother] entered a guilty plea to the previously cited charges on August 22, 2019 to Possessing an Instrument of Crime and Criminal Mischief. She [received] an aggregate sentence of [18] months' probation. She was to make monthly restitution payments to the victims, continue with mental health treatment and abide by any recommended course of treatment, including taking her prescribed medications[.]

On September 4, 2019, a Goal Change Hearing was held. Only minimal progress had been made by either parent towards alleviating the circumstances which necessitated the original placement, and the [C]hildren's goal was changed to adoption. To date, [Mother] continues to reside in a group home, with no discharge date identified. [Father] has voluntarily relinquished his rights to [the Children].

[The Children] have been residing in the same foster home since Emergency Protective Custody was granted and the foster family is able to provide permanency for both children.

Orphans' Ct. Op., 8/24/20, at 1-5.

On February 27, 2020, CYS filed petitions to terminate Mother's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). The orphans' court appointed Hillary Madden, Esquire, to serve as guardian *ad litem* and legal counsel (GAL/Counsel) for the Children.[3] The

---

[3] *See In re Adoption of L.B.M.*, 161 A.3d 172, 174 (Pa. 2017) (plurality) (23 Pa.C.S. § 2313(a) mandates the appointment of counsel for children involved in contested involuntary termination of parental rights proceedings). *See also In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018) (trial court did not err in allowing the children's guardian *ad litem* to act as their sole representative

orphans' court held a hearing on June 24, 2020; the Children were four and two years old at this time. CYS presented the testimony of the child J.T. and CYS caseworkers Diana Brown and Jennifer Payne. Mother presented the testimony of her therapist, Jacqueline Coughlin. Mother and Father both testified on their own behalf. The GAL/Counsel presented the testimony of V.O., one of the foster fathers. He testified J.T. has been in his care since she was three years old, and T.M. since he was "a little under two months old." N.T. at 93.

On the same day, the orphans' court terminated Mother's parental rights to J.T. and T.M. On July 24, 2020, Mother timely filed separate notices of appeal at each docket,[4] along with Pa.R.A.P. 1925(a)(2) concise statements

_____

in termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome). Here, the GAL/Counsel filed a brief in support of terminating Mother's parental rights. **See In re: Adoption of K.M.G.**, 219 A.3d 662, 670 (Pa. Super. 2019) (*en banc*) (while this Court has authority to raise *sua sponte* issue of whether the trial court appointed any counsel for the child, but not the authority to *sua sponte* review "whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding"), *aff'd* ____ A.3d____ (Pa. Nov. 10, 2020).

[4] We note the electronic trial records transmitted on appeal would indicate Mother's notices of appeal were untimely filed. The records each include a "certified docket sheet," which indicates the order terminating Mother's parental rights was entered on the docket on June 25, 2019. The 30th day thereafter was Saturday, July 25, 2020. **See** Pa.R.A.P. 903(a) (notice of appeal shall be filed within 30 days after entry of the order from which appeal is taken). Mother thus had until Monday, July **27th** to file a notice of appeal. **See** 1 Pa.C.S. § 1908. However, the "certified docket sheet" states Mother filed an "Amended Notice of Appeal *Nunc Pro Tunc*" on July **29th**. Despite the

of errors complained of on appeal. On September 1, 2020, this Court *sua sponte* consolidated her appeals.

Mother raises the following claims for our review:

Did [CYS] fail to present clear and convincing evidence that termination of [M]other's parental rights served the needs and interests of [the Children] under [23 Pa.C.S.] § 2511(a)?

Did the [orphans'] court err in terminating [Mother's] parental rights without clear and convincing evidence that termination of [M]other's parental rights served the needs and interests of [the Children] under [23 Pa.C.S.] § 2511(b)?

Did the [orphans'] court err in terminating [Mother's] parental rights based upon mental illness and collateral issues arising from mental illness?

Mother's Brief at 11.

Preliminarily, we note that while Mother has raised her mental health as a separate issue, we consider her mental health arguments as part of the inquiries into whether the orphans' court properly terminated her parental

_____

title of this document, it is the only notice of appeal in the record, and there is nothing indicating the orphans' court granted leave for Mother to file a notice of appeal *nunc pro tunc*.

Nevertheless, on appeal, Mother provided to this Court for filing on our docket, a copy of a different notice of appeal (entitled "Notice of Appeal"), which bears the notation "Monroe County Clerk of Courts Received 7/**24**/2020 11:05 AM." Mother's Notice of Appeal/IFP Docketed, 8/10/20. Attached to the notice of appeal is a copy of the orphans' court's official docket, which confirms this notice of appeal was filed with the ophans' court on July 24, 2020. We note the orphans' court, CYS, and GAL/Counsel have **not** disputed the timeliness of Mother's notice of appeal, and in light of all the foregoing, we deem it was timely filed.

rights under subsections 2511(a) and (b). To the extent that Mother attempts to liken mental illness to incarceration and cites caselaw concerning the termination of the parental rights of incarcerated parents, we find her argument lacks merit. *See* Mother's Brief at 30-31.

First, Mother asserts the orphans' court erred in finding CYS demonstrated by clear and convincing evidence that termination of her parental rights served the Children's "emotional needs and welfare" under subsection 2511(a). Mother's Brief at 19. Mother acknowledges she "has been in and out of mental health providers and group homes in an effort . . . to cope with her mental illness," but she maintains that "[a]t no time did [she] give up, refuse treatment, or not respond to [CYS] because of a deliberate choice." *Id.* at 22. Mother explains that "soon after[ ]" she attempted to give up T.M., she "regretted and recanted" this decision." *Id.* She also argues she "did, and continues to, show her willingness to cooperate with [CYS] to obtain the services necessary in order for her to perform her parental duties," and that since her discharge following her April 1, 2019, involuntary commitment, "there has been over a year of compliance [with] mental health services." *Id.* at 22-23. Mother concedes she "did not have adequate housing or substantial employment, but [contends that] these grounds alone are not drastic enough to terminate her parental rights." *Id.* at 24.

We note the relevant standard of review:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and

credibility determinations of the trial court if they are supported by the record." "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the present case, the orphans' court terminated Mother's parental rights pursuant to subsections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a), in addition to subsection 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those

grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In its opinion, the orphans' court discussed its decision to terminate Mother's parental rights pursuant to Section 2511(a)(2):

> Here, the testimony showed [Mother] stated that she was unable to take [care] of [T.M.] prior to his Emergency Custody [Order] and she [wanted] to give him up by using the Safe Haven Act. [N.T. at 17. Mother] has also suffered from mental health issues such as attacking her neighbor with a hammer. [*Id.* at 23.] She also had instances where she barked like a dog and looked into a mirror and laughed and talked to herself. [*Id.* at 28.] The testimony showed [that] when she had supervised visits with the [C]hildren she appeared overwhelmed and not very engaged with [them. *Id.* at 29.] Therefore[, Mother] has clearly shown an inability to provide essential parental care, control or subsistence necessary for the [C]hildren's well being.

Orphans' Ct. Op. at 7-8.

Our review of the record supports the orphans' court's conclusions. The orphans' court credited the testimony of CYS Caseworkers Brown and Payne regarding Mother's extensive history of mental health issues, which caused her to become aggressive and require hospitalization multiple times. *See* N.T. at 30. Ms. Brown indicated CYS had concerns about Mother's "non-interaction" with the Children during visits because Mother "would not engage the [C]hildren. She would just stare in[to] space." *Id.* at 38-39. Mother's visitation with the Children remained "supervised due to her behavior." *Id.* at 44. At the time of the termination hearing, Mother had only recently obtained employment and had not obtained housing. *Id.* at 59.

Thus, the record demonstrates that Mother is incapable of providing the Children with proper parental care, and that she cannot or will not remedy her parental incapacity. J.T. has been in foster care for 22 months and T.M. has been in foster care for 23 months. N.T., 6/24/20, at 59. Despite almost two years of opportunities, Mother made only minimal progress toward compliance with her goals. The Children are in need of a permanent and stable home, and their lives cannot remain on hold forever. *See In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006) ("[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."). Therefore, we discern no abuse of discretion by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(a)(2).

Next, Mother contends CYS presented insufficient evidence regarding her bond with the Children. Mother argues that if there is a lack of a bond between her and the Children, it is due to her mental health and is beyond her control. Mother's Brief at 29.

With respect to subsection 2511(b), we consider whether termination of parental rights will best serve the Children's developmental, physical and emotional needs and welfare. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). "In this context, the court must take into account whether a

bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* "[A] parent's basic constitutional right to the custody and rearing of. . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

"When conducting a bonding analysis, the court is not required to use expert testimony. [Instead, s]ocial workers and caseworkers can offer evaluations as well." *In re Z.P.*, 994 A.2d at 1121. "Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). "'Above all else . . . adequate consideration must be given to the needs and welfare of the child.' A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d at 1121.

> Here, the orphans' court reasoned:
>
> [Mother] has a long history of mental health problems. [Her] mental health is still a concern and it is not known if it could be remedied in a reasonable period of time despite the services provided to her since the dependency adjudication. The need for stable family life would best serve the needs of the [Children].
>
> . . . [Mother] has continued to show an incapacity to care for the [C]hildren. As noted above, she continues to exhibit mental health problems, she has no housing for the [C]hildren, and she resides in a group home. [N.T. at 55.] The best interest[s] of the

> [C]hildren will be served by termination of parental rights of [Mother]. In the foster home both [Children] are doing well. In the foster home are two other children who are eight years old. [**Id.** at 97.] The two [C]hildren refer to them as their brothers[. **Id.** at 96.] The foster parents are willing and encouraging a relationship with the biological parents. [**Id.** at 95.] Given that the foster family is providing a stable, protective and loving relationship to [the Children,] termination of parental rights is warranted.

Orphans' Ct. Op at 8-9.

The competent evidence in the record supports the orphans' court's determination that termination of Mother's parental rights would serve the Children's best interests. As of the date of the hearing, T.M. was in care for 23 months and J.T. was in care for 22 months. N.T. at 59. The Children are in the same foster home. The orphans' court credited the testimony of Ms. Brown that in the foster home the Children "were very comfortable. The foster parents were very attentive to them. They made sure that all their needs are met." **Id.** at 44. Ms. Brown noted that J.T. did not exhibit any concerns when she was first separated from Mother. **Id.** The orphans' court credited Ms. Payne's testimony describing the Children's relationship with their foster parents. Specifically, Ms. Payne explained: "[The Children are] very bonded to both foster parents. There's two other children in the home and they're very bonded, they act like siblings, all four of them together, but they do very well in that home." **Id.** at 58. The orphans' court credited the testimony provided by CYS that Mother has not put herself in a position to provide safety and stability for the Children throughout this case. Contrary to Mother's

- 13 -

contentions, Ms. Brown and Ms. Payne provided ample testimony in support of their opinions regarding the Children's relationship with Mother. This is especially true given the Children's young ages and the fact that they have spent most of their lives in foster care. ***See Matter of Adoption of M.A.B.***, 166 A.3d 434, 449 (Pa. Super. 2017) ("[A] child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time.").

The orphans' court appropriately considered the Children's need for safety and stability and determined that termination of Mother's parental rights best met the Children's needs and welfare. After careful review, we find there is competent evidence of record that supports the orphans' court's decision. We do not discern an error of law or abuse of discretion. Accordingly, we affirm the orders involuntarily terminating Mother's parental rights to J.T. and T.M.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/8/21